IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

CRYSTAL LYNN ROBERTSON,            )
                                   )
            Plaintiff,             )
                                   )
vs.                                )    Case No. 12-3045-CV-S-ODS
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
            Defendant.             )

## ORDER AND OPINION AFFIRMING
## COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying her application for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

### I. BACKGROUND

Plaintiff was born in October 1978, has earned her GED, and has prior work experience as a stocker, laborer, and order clerk. She filed her application for benefits in July 2010, alleging she became disabled on August 21, 2007, due to a combination of PTSD, depression, and panic disorder.

In early January 2007, Plaintiff went to Missouri Ozarks Community Health ("MOCH") to establish care. She indicated she wanted to "change medications for depression and anger." There are no records documenting the circumstances or assessments that led to her prior prescriptions, but she reported that she had "been on depression medications off and on for several years since age 16." She was referred to a psychiatrist for assessment and was provided Effexor to use until she could make that appointment. R. at 261. The following month she sought a refill of Neurontin and reported feeling unmotivated and not "feel[ing] right in the head." The doctor at MOCH

noted plaintiff was "alert, oriented, and in no acute distress," diagnosed her as suffering from depression, and increased her Effexor and decreased the neurontin. R. at 260. In March, Plaintiff reported that since the change in medication dosages she "feels pretty good" – in fact, "better than she has in six years." She was not depressed, and her medications were continued. R. at 259. However, by the end of March she developed a rash that made her sensitive to sunlight. R. at 258. It was eventually determined the rash was a reaction to the Effexor. Plaintiff was reluctant to stop using the Effexor because it was so effective, so she initially tried using sunscreen. R. at 255.

In June 2007, Plaintiff was still using Effexor, and Wellbutrin was added. R. at 254. However, Plaintiff stopped using Wellbutrin "because it made her feel down, not herself," but once she stopped she felt better. In July the Wellbutrin was replaced with Celexa and the dosage of Effexor was halved. R. at 253. On August 13 – one week before her alleged onset date – Plaintiff reported "doing well" on her medication and denied experiencing side effects other than the Effexor-related rash (for which she was prescribed a corticosteroid cream). Her depression was described as "stable." R. at 252. In December her Celexa was refilled but no mention was made of Effexor. R. at 251.

Plaintiff began complaining of respiratory problems in March 2008, and on March 28 her medication was changed to Wellbutrin. R. at 249. In April, Plaintiff reported the Wellbutrin was not working for her, indicated she did better on Celexa, and requested a higher dose of Celexa. Her wish in this regard was granted. R. at 245. In mid-July, Plaintiff reported feeling more moody and having "some days feeling very happy and some days feeling very low." These symptoms coincided with her husband's surgery. She was instructed to eat normal meals (she had been eating only 500 calories per day) and return in a week. R. at 244. Plaintiff's next went to MOCH in September 2008, at which time Plaintiff again asked about increasing her Celexa and inquired about taking Chantix. Use of Chantix required consultation with a cardiologist, but the Celexa was increased. R. at 243.

Over one year later, Plaintiff returned to MOCH complaining of a pin-worm infection. She also reported experiencing mood swings and was instructed to continue taking her medication. R. at 237-39. In November 2009 she again reported

2

experiencing mood swings, and was again told to continue taking her Celexa as she was already at the maximum recommended dosage.  R. at 234-36.  Similar exchanges occurred through the remainder of 2009.  R. at 227-34.

Plaintiff returned to MOCH in July 2010 complaining of shortness of breath and a sore throat.  She was observed to be "alert and active . . . and in no acute distress."  Plaintiff made no mention of experiencing any particular problems related to depression or anxiety.  R. at 223-24.  Plaintiff next went to MOCH in April 2011 complaining of breathing difficulty and chest discomfort.  She was again observed to not be in any other distress and she did not make any complaints regarding anxiety, depression, or related conditions.  R. at 302-04.

On May 4, 2011, Plaintiff went to a psychologist (Dr. Deanna Wolf) to begin receiving treatment.  Plaintiff reported that she is unable to leave her home or fenced yard, could not work due to panic attacks, experiences a hostile and angry mood, was indecisive, and a host of other conditions.  She denied engaging in any activities because of her inability to leave her home.  Dr. Wolf assessed Plaintiff as suffering from chronic PTSD, Major Depressive Disorder (single episode, severe), and assessed Plaintiff's GAF at 40.  R. at 312-14.  The following week, Plaintiff went back to MOCH "needing medication for depression" because she was suffering from bouts of anger, anxiety, and possible obsessive compulsive disorder.  She was observed to be "in no acute distress" and was not "anxious or withdrawn."  The record from this visit does not reflect that any medication for depression was prescribed.  R. at 300-02.  The week after that, Plaintiff reported to MOCH that she was experiencing a recurrence of "rages that occurred in her younger youth;" she was told to continue her current medications and was provided a two-month supply of Prozac.  R. at 297-99.

Meanwhile, Plaintiff had also begun attending weekly counseling sessions with Dr. Wolf.  On May 12 she expressed concern about her husband and his back problems and described how her own anxiety increased during times of stress.  R. at 311.  On May 18, she brought her husband to recount a fight the two of them had.  During the session Plaintiff "vacillated between crying and hyperventilating and slowly calming down."  R. at 309.  On May 26, Plaintiff told Dr. Wolf about her husband's recent medical tests, his need for surgery, and recounted "that she can't even concentrate" and

had difficulty making decisions, and her anxiety increases whenever she leaves her home.  R. at 308.  In the ensuing sessions, Plaintiff continued to discuss the stress brought on by her husband's health problems as well as past incidents from her life that contributed to her anxiety.  R. at 306-08.

On June 29, 2011, Dr. Wolf completed a Medical Source Statement – Mental ("MSS") which consisted of twenty "check the box" questions.   Dr. Wolf's MSS indicated Plaintiff is markedly limited in her ability to remember work procedures, remember and carry out detailed instructions, maintain attention and concentration, conform to a schedule, and work with or near others, complete a normal workday, and respond to changes in the work setting.  The MSS also indicates Plaintiff is extremely limited in her ability to travel in unfamiliar places or use public transportation.  The MSS does not indicate how long these conditions had existed or were likely to exist.  One of the questions asks whether these limitations existed prior to June 30, 2008, but Dr. Wolf did not answer this question.  R. at 316-17.

On July 19, 2011, Plaintiff underwent a consultative psychological examination performed by Dr. David Lutz.  Plaintiff told Dr. Lutz she experienced panic attacks two to three times a week, bouts of anger lasting up to a day, and two to three suicide attempts (the most recent of which was within the preceding couple of months).  R. at 324-25. Based on his discussions with Plaintiff, his review of Plaintiff's records, and tests that he performed, Dr. Lutz diagnosed Plaintiff as suffering from panic disorder with agoraphobia, chronic PTSD, and possible depression.  R. at 328.  He believed Plaintiff could understand, remember, and follow simple to moderately complex tasks, would have difficulty with complex tasks, and could "interact in limited to possibly moderately demanding social situations."  He assessed her GAF score at 55.  R. at 329.

In October 2011, approximately two months after the administrative hearing, Plaintiff was hospitalized for approximately one week following her report of uncontrolled anger and threats to hurt her husband and children.  She was placed on "assault, elopement and suicide precautions."  On admission her GAF was 35, but on discharge it was 75.  R. at 351-57.

The administrative hearing was held in late August 2011.  Plaintiff testified she stopped working in 2006 due to her panic attacks and believed she could not return to

4

work because of panic attacks and anxiety. R. at 43-44. Her daily activities consist of watching television, playing electronic games, preparing meals, washing dishes, and performing other household tasks. R. at 47-48. She attends her children's school functions if her husband goes with her, and has family visit once or twice a week. R. at 48-49. Plaintiff testified she suffers five to eight panic attacks in a typical week, during which she will "basically just sit on [the] couch and do nothing but zone out." The attacks last from thirty minutest to a couple of hours. She also reported crying herself to sleep every night due to depression. R. at 49-50.

      The ALJ found Plaintiff could lift or carry up to ten pounds continuously, up to twenty pounds frequently, and up to fifty pounds occasionally. She also found Plaintiff could stand or walk for two hours at a time and up to four hours per day, sit for four hours at a time and up to seven hours a day, and had no other physical limitations of note. The ALJ found Plaintiff "is limited to occupations that require the performance of simple, routine, and repetitive tasks and which require no more than occasional interactions with the public." R. at 25. In reaching this conclusion, the ALJ noted Plaintiff's positive reports to MOCH regarding the effects of medication. R. at 26. The ALJ discounted Dr. Wolf's opinions, noting they addressed situational problems (such as her husband's health issues). She also noted Plaintiff's statements indicating she sought counseling from Dr. Wolf at her attorney's insistence in order to bolster her disability claim, which suggested her problems were not sufficiently severe to motivate her to seek counseling independent of her disability claim. R. at 27-28.

      Based on the vocational expert's testimony, the ALJ found Plaintiff could not return to her past relevant work. However, based on that same testimony, the ALJ found Plaintiff could work as a riveting machine operator, automatic metal spraying machine operator, and bit sharpener operator. R. at 30-31.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the

5

Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

### A. Failure to Defer to Dr. Wolf's Opinion

Plaintiff first faults the ALJ for failing to accord controlling weight to Dr. Wolf's opinion. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., E.g., Anderson v. Astrue, 696 F.3d 790, 793-094 (8th Cir. 2012); Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010). Moreover, "[t]he treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians." Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation omitted).

In this case, Plaintiff received treatment from MOCH for more than three and a half years. In contrast, Plaintiff had seen Dr. Wolf for two months before Dr. Wolf prepared her MSS, and had seen Dr. Wolf for almost four months by the time of the administrative hearing. In deciding how much deference was due Dr. Wolf, the ALJ was entitled to consider Dr. Wolf's relatively brief treating history and issue findings consistent with MOCH's reports. Dr. Wolf's MSS purported to identify Plaintiff's limitations, but Dr. Wolf did not indicate how long Plaintiff would be expected to suffer from them or how long Plaintiff had suffered them. Dr. Wolf's MSS thus fails to establish Plaintiff became disabled on Plaintiff's alleged onset date, and also fails to establish that Plaintiff had or could be expected to suffer from the limitations for more

6

than a year – which is required before benefits can be granted.  As the ALJ noted, Dr. Wolf described Plaintiff as suffering from situational problems, not medical or mental problems of a long-standing nature.  Depression and anxiety brought about by temporary situational factors are not typically thought of as a valid basis for a disability claim.  Cf. Gates v. Astrue, 627 F.3d 1080, 1082-83 (8th Cir. 2010).  For all of these reasons, the Court concludes the ALJ did not err in declining to defer to Dr. Wolf's opinion.

B.  Plaintiff's Credibility and Determination of Her Residual Functional Capacity

In two related arguments, Plaintiff argues the ALJ failed to properly (1) evaluate her credibility and (2) determine her residual functional capacity ("RFC").  The Court discerns no error.

Starting first with the issue of credibility, the familiar standard for analyzing a claimant's testimony is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced.  The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.  The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>   1.  The claimant's daily activities;
>   2. the duration, frequency and intensity of the pain
>   3. precipitating and aggravating factors;

7

> 4. dosage, effectiveness and side effects of
> medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints solely on the basis of personal
> observations. Subjective complaints may be discounted if
> there are inconsistencies in the evidence as a whole.

739 F.2d at 1322. The ALJ considered appropriate factors; Plaintiff's complaint really addresses the manner in which the ALJ weighed those factors. However, it is the ALJ's responsibility to weigh the relevant factors. The Court can insure the proper factors are considered, and can insure that substantial evidence in the Record as a whole supports the findings, but the Court cannot reweigh the factors.

Here, there are significant conflicts between Plaintiff's testimony (and her statements to Dr. Wolf) and Plaintiff's statements to those from MOCH who were treating her for the majority of the period in question. MOCH's reports about the effectiveness of medication also undermines Plaintiff's claims. Plaintiff points to the report from her October 2011 hospitalization as further support for her testimony, but that report is not as supportive as she contends because it (1) suggests her GAF on discharge was 75, (2) her GAF for the past year was 75, and (3) the event was the product of a temporary stressor and does not confirm Plaintiff suffers from a long-term and disabling condition that was expected to continue or that had begun in August 2007. Finally, while a person who watches television and plays video games may be disabled, the ALJ was entitled to conclude that Plaintiff's ability to watch television and play video games belied her claim of an inability to concentrate.

It is not the Court's role to re-evaluate a claimant's credibility. Here, substantial evidence in the Record as a whole supports the ALJ's finding that Plaintiff's testimony overstated her limitations. This conclusion allows the Court to consider the RFC determination. In this regard, it is important to note that the RFC needs to include the limitations found to exist, and need not include those limitations identified by the claimant but found not to exist. E.g., Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010). Plaintiff faults the ALJ for placing too much evidence on Dr. Lutz's consultative opinion, primarily because it contradicts Dr. Wolf's MSS. As previously noted, the ALJ

8

was justified in declining to defer to Dr. Wolf's opinion.  Moreover, there is significant similarity between the two opinions, most notably with regard to Plaintiff's ability to follow instructions and interact with other people.  In this regard it should be noted the RFC included limitations in these areas.  Ultimately, Plaintiff's arguments about the RFC are dependent on her other arguments: inasmuch as they have been rejected, her arguments about the RFC are rejected as well.

### III.  CONCLUSION

For these reasons, the Commissioner's final decision denying Plaintiff's applications for benefits is affirmed.

IT IS SO ORDERED.

                                                  /s/ Ortrie D. Smith
                                                  ORTRIE D. SMITH, SENIOR JUDGE
DATE:  January 29, 2013                    UNITED STATES DISTRICT COURT